## HELTON v. UNITED STATES.

### No. 9670.

Circuit Court of Appeals, Sixth Circuit.

July 17, 1944.

Alfred B. Huddleston and Clarence L. Cummings, both of Murfreesboro, Tenn., for appellant.

Fred S. Powell, of Nashville, Tenn. (Horace Frierson, A. O. Denning, and Fred S. Powell, all of Nashville, Tenn., on the brief), for appellee.

Before HICKS, SIMONS, and McALLISTER, Circuit Judges.

McALLISTER, Circuit Judge.

Appellant was tried before a jury and convicted of assaulting an examining physician for a Selective Service Board, in violation of § 311, 50 U.S.C.A.Appendix. The section provides for fine or imprisonment, or both, of any person who knowingly hinders or interferes in any way, by force and violence, with the administration of the Selective Training and Service Act of 1940, or the rules and regulations made pursuant thereto. The district court sentenced appellant to four years' imprisonment. Error is claimed on the ground that the evidence did not support the conviction and that the sentence inflicted cruel and unusual punishment in contravention of the federal constitution.

Appellant, at the time of the trial, was a married man 35 years old. He registered for Selective Service in October, 1940, and was placed in Class 1-A. On notification to appear for his physical examination, he presented himself at the office of the local Board on December 23, 1940, before Dr.

Andrew Jamison, a duly appointed, examining physician for the Board. Appellant told Dr. Jamison that he had had a heart attack or a fainting spell some time before, and several years previously, had suffered a sun stroke and a nervous breakdown. The doctor examined his heart and found nothing wrong with it, and, thereupon, told him that he found him physically fit for military service. Appellant further complained of being nervous, and appeared to be nervous, but the doctor told him that the Army would, or might, be good for him or good for his nerves. Dr. Jamison did not sign the report of the examination, as that was the duty of Dr. Murfree, the chief examining physician for the Board. Dr. Murfree was out of the city at the time that Dr. Jamison made his examination of appellant. Later, before Dr. Jamison's report was presented to Dr. Murfree for signature, appellant came to Dr. Jamison's office and told him that Dr. Murfree wanted to do the whole physical examination. Thereafter, Dr. Jamison had no further contact with appellant, but he stated that, subsequently whenever he passed appellant on the street, he appeared to be cold, and less friendly to him than before the examination.

It appears that Dr. Murfree referred appellant to Dr. Walton, a member of the staff of the United States Veteran Facility, near Murfreesboro, Tennessee, with the suggestion that appellant was suffering from psychoneurosis. Dr. Walton then examined the appellant and reported, on January 29, 1941, that he was suffering from psychoneurosis hysteria. Upon the basis of this report, the local Board placed appellant in Class IV-F on January 31, 1941. On June 5, 1942, appellant was given a further physical examination by Dr. Murfree, as a result of which the local Board classified him as I-A on June 12, 1942. He was then called for induction and sent to the induction center at Fort Oglethorpe, Georgia, where he was re-examined and rejected on account of psychoneurosis. Thereafter, the local Board reclassified him and returned him to Class IV-F.

On the afternoon of June 10, 1943, Dr. Jamison stopped at a drug store adjoining his office building, near the public square of Murfreesboro, in order to have a prescription filled, and afterward stopped at the soda fountain for a soft drink. He noticed appellant sitting at one of the counter stools near the end of the fountain, and heard him ask one of the waitresses behind the counter, whether she knew "this man." The girl replied that she did not, and appellant then stated, "This is the Doc." As Dr. Jamison was about to leave the store, appellant walked toward him and said, "I've got it in for you." Upon receiving no reply from the doctor, who started toward the door of the store, appellant said, "Did you hear what I said?" The doctor replied that he did but that he had considered the source and paid no attention to him, and continued to walk out of the store and entered his automobile, which was parked at the curb. Appellant followed the doctor, who turned to him and said, "Clyde, go on, I don't want to have any trouble with you. You think I have been trying to put you in the Army for two years." Appellant replied, "Come on out and fight," and called the doctor an insulting and villifying name. He then grabbed the doctor, a man 63 years old, by the arm and around his neck, pulled him out of the car, struck him several times with his bare fists, blacked both his eyes, and knocked him down so that his head struck the pavement, causing a cut. While the doctor was down and appellant was still striking him, some soldiers came along and pulled appellant away. As soon as the soldiers turned, appellant immediately came back and threw the doctor to the street. Other parties pulled appellant away from the doctor, and later, a member of the police force appeared and told appellant to get into the police car and accompany him to the jail. On their way over, the police officer remarked to appellant, in the presence of another officer, that he might have killed the man he assaulted. Whereupon, appellant replied that he hoped he did kill him, because "he's been trying to get me in the Army for the last two years." Later, a special agent of the Federal Bureau of Investigation had a conversation with appellant; when he was brought before the United States Commissioner in the initial proceedings in this case, and asked him why he had struck Dr. Jamison, and appellant answered that the doctor had been trying to put him into the Army. Further evidence disclosed that appellant had told Dr. Rawlins, some time before the assault, that Dr. Jamison was "railroading" him into the Army.

Appellant testified that he did not have any grudge against Dr. Jamison for anything that happened during the course of

his first physical examination, but claimed that his wife had told him that Dr. Jamison had stared and looked at her the whole time, on a certain occasion when she was in the drug store, and that he had also stared and looked at her on other occasions. She testified, on the trial, to the same effect. Appellant asserted that Dr. Jamison had a bad reputation with regard to women, that he had heard that he was going around with a certain girl, and that he was very angry about the story of his wife's being subjected to such staring. He stated that he did not intend to have any fight with the doctor, but had only informed him that he wanted to talk to him about a matter and that the doctor had made a profane exclamation, and reached for a compartment in his automobile. Appellant claims that he thought the doctor was trying to get at a pistol, and that the scuffle resulted; that after the soldiers had separated them, he thought the doctor was still trying to find a pistol and he grappled with him again.

The jury did not believe appellant's story. They had the right to draw the conclusion that appellant was nursing a grudge against the doctor for what he had told him, on his first physical examination, to the effect that the Army would be a good thing for him, and that he was physically fit for military service. There was substantial evidence that he had made accusations that he was going to "get" the doctor; that he had remarked to another witness that the doctor was trying to force him into the Army; that just before the fight, he had threatened the doctor that he had it in for him; and, from the statements to the two police officers and the federal agent afterward, that he had committed the assault because of some peculiar feeling of vengeance arising out of the fact that the doctor had approved him for military service, and, as a Selective Service official, whose duties were to certify draftees as fit for military service, was still trying to subject him to service. Appellant's explanation about his anger over the doctor's looking at his wife appears to have been considered by the jury as a fiction designed for the purpose of defense and resulting in an attempt to discredit and besmirch Dr. Jamison and, incidentally, a young girl who was innocent of wrongdoing. As far as the evidence discloses, appellant had never mentioned this story to anyone until the trial, although he had told several parties, after the assault, that he wished he had killed the doctor because of the latter's efforts to place him in the Army. There was substantial evidence from which the jury could find that the assault was caused by Dr. Jamison's exercise of his duties as a Selective Service physician.

An assault upon a member of such a Board, or one of its examining physicians, growing out of his exercise of duty, is an interference by force and violence with the administration of the Act. The orderly functioning of the Board could not continue if its members or physicians were restrained from exercising their free judgment by fear, and if they felt they would not be safe, in the exercise of their duties, from the attacks of those who became vengeful as a result of their official decisions. Moore v. United States, 5 Cir., 128 F.2d 974; Burwell v. United States, 4 Cir., 137 F.2d 155. The sentence, imposed within the statutory limit, is not reviewable. The claim that it was a gross and palpable abuse of discretion is without merit.

The judgment of the district court is affirmed.